Cite as 2020 Ark. App. 79

# ARKANSAS COURT OF APPEALS

DIVISION II

**No.** CV-19-296

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF L.W. AND Z.W., MINORS | **Opinion Delivered:** February 5, 2020 |
| MARTIN GOINS AND KAREN GOINS | APPEAL FROM THE CROSS COUNTY CIRCUIT COURT [NO. 19PR-18-92] |
| APPELLANTS | HONORABLE CHRISTOPHER W. MORLEDGE, JUDGE |
| V. | |
| KORY WHITE AND COURTNEY WHITE | AFFIRMED |
| APPELLEES | |

**MEREDITH B. SWITZER, Judge**

Martin and Karen Goins appeal from the trial court's denial of their motion to intervene in an adoption case involving their minor grandsons, L.W. and Z.W. They contend the trial court erred in finding that they did not stand *in loco parentis* with their grandsons and that they could not intervene in this adoption matter. We affirm.

Jennifer White is the Goinses' daughter and L.W. and Z.W.'s mother. Kory White is the boys' father and the Goinses' former son-in-law. L.W.[1] was born in May 2005, before Kory and Jennifer were married. Jennifer lived with her parents while she was pregnant with L.W. and continued living there until he was six to twelve months old. Kory and Jennifer married in November 2005, and Z.W. was born in July 2009. They divorced in

---

[1]Because L.W. was born before Jennifer and Kory married, his last name is Goins, but there is no dispute that Kory White is his biological father.

2014 and were awarded joint custody of L.W. and Z.W. In September 2015, however, Kory was awarded sole custody of the children with Jennifer having only restricted visitation rights. It is undisputed that Jennifer developed a serious drug problem as early as 2010 while she and Kory were married. Her drug problem, which ultimately included a period of homelessness starting around January 2016, necessitated substantial help from her parents to care for the children.

Specifically, Jennifer testified that for five or six months after L.W. was born, her parents took care of him. She also testified that after Z.W. was born, she lived with her parents off and on, "a couple of weeks here and a couple of weeks there," and that her parents provided food and shelter for her and the children during those periods of time. She stated that before the divorce, she and Kory were the children's caretakers. After the divorce, Kory was the caretaker, but her parents had "contact" and "involvement" with the children.

Karen Goins testified that Jennifer lived with her and Martin when L.W. was born and that Jennifer served as his primary caregiver. She explained that Jennifer and Kory were married and lived in their own home when Z.W. was born, and that Jennifer and Kory were the children's primary caregivers. Karen stated that at the time of Jennifer and Kory's divorce, she considered herself and Kory to be the children's primary caretakers and that she took care of the children while Kory worked. She explained that in 2010, even prior to the divorce, she quit her job to assist with the children because of Jennifer's drug problem but that she still considered Jennifer to be the custodian or parent of the children. She explained that Jennifer and L.W. lived with her and Martin after L.W.'s birth and that she

2

and Martin provided for Jennifer's and L.W.'s care, food, and shelter during that time. She also testified that after Z.W. was born, Kory, Jennifer, and the children did not live with the Goinses, but she and Martin took care of the children while Kory worked. The children were not at the Goinses' house every day but were there a lot. She stated that she provided more than babysitting services because she took care of the children, loved them, and fed them as if they were her own children.

Martin Goins testified that after Z.W. was born, the children were at the Goinses' house six days a week from seven in the morning until seven at night and one night on weekends during the summer. He stated that he and Karen provided food and shelter for the children when they were there. He said that the kids continued to stay with them after Jennifer went to a shelter and that he and Karen were not just babysitting because they were taking care of the children. Martin acknowledged that Kory did not abandon his parental responsibilities; however, when he dropped the children off at the Goinses on weekends they speculated that he was spending time with his girlfriend. He stated that Jennifer was there for the children off and on until she went into a homeless shelter in 2016.

In 2016, Karen told Kory that she wanted to alternate weeks keeping the children, sharing that responsibility with his then girlfriend and now wife—Courtney. According to Karen, Kory was not pleased with the suggestion and stopped letting the Goinses see the children. The Goinses were subsequently allowed to intervene in Jennifer and Kory's domestic-relations case to seek visitation with the children. Mediation was ordered, and an agreement was reached for the Goinses to have scheduled visitation with the children. By

3

order entered on February 22, 2018, the trial court adopted the mediated agreement as its own findings, and the parties were directed to abide by its terms.

On October 10, 2018, Kory and Courtney filed a petition to adopt L.W. and Z.W. On November 6, the Goinses filed a petition to intervene and also a response to the adoption petition. On November 16, Kory and Courtney responded to the Goinses' petition to intervene. Jennifer also opposed the petition for adoption with her own answer and amended answer.

The petition to intervene was heard on December 12. By order entered on January 15, 2019, the trial court denied the Goinses' petition to intervene, finding that the Goinses had not stood *in loco parentis* to the two minor boys, that Jennifer is not deceased, and that Jennifer had entered her appearance in the adoption case.

There are two means by which a nonparty may intervene in a lawsuit: as a matter of right and by permission. *Burt v. Ark. Dep't of Health & Human Servs.*, 99 Ark. App. 402, 261 S.W.3d 468 (2007); Ark. R. Civ. P. 24. The former cannot be denied, but the latter is discretionary and will be reversed only if the exercise of that discretion is abused. *Id.* In their petition to intervene, the Goinses specifically sought permissive intervention pursuant to Rule 24(b)(2) of the Arkansas Rules of Civil Procedure, which provides for intervention when an applicant's claim or defense and the main action have questions of law or fact in common. The Goinses asserted that the children's best interests were at issue in the adoption proceeding and granting the adoption would effectively terminate their grandparent-visitation rights.

4

For their first point of appeal, the Goinses contend that the trial court erred in concluding they did not stand *in loco parentis* to L.W. and Z.W. *In loco parentis* refers to a person who has assumed all the obligations incident to the parental relationship and who has actually discharged those obligations. *Winn v. Bonds*, 2013 Ark. App. 147, 426 S.W.3d 533. The Goinses alleged that they had assumed and discharged those obligations in L.W.'s and Z.W.'s lives. The trial court found they had not. In reviewing an *in loco parentis* ruling, our supreme court has explained that matters that sound in equity are traditionally reviewed de novo on the record with respect to fact questions and legal questions. *Daniel v. Spivey*, 2012 Ark. 39, 386 S.W.3d 424. We will not reverse a trial court's finding unless it is clearly erroneous. *Id*. We have further stated that a trial court's finding of fact is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all the evidence is left with a definite and firm conviction that a mistake has been committed. *Id*.

The Goinses made significant sacrifices and were enormously helpful in caring for L.W. and Z.W., especially when Jennifer developed a serious drug problem. Despite the critical role they played in caring for the children, we are not left with a definite and firm conviction that the trial court made a mistake in finding they had not assumed and discharged all the obligations incident to the parental relationship. The Goinses candidly acknowledged that Kory never abandoned his parental responsibilities. Even though the Goinses spent considerable time caring for the children while Kory worked, it was always clear L.W. and Z.W. would return to Kory after work. Moreover, Karen stated that she considered Jennifer to be the children's parent but quit her job in order to assist with the children's care because Jennifer suffered from a drug problem. Given these facts, we

5

conclude that the trial court did not clearly err in finding that the Goinses did not stand *in loco parentis* to the children.

For their remaining point of appeal, the Goinses challenge the trial court's refusal to allow them to intervene in the adoption case. They assert they should have been allowed to intervene as a matter of right pursuant to Rule 24(a). As mentioned previously, however, their petition to intervene specifically asserted permissive intervention pursuant to Rule 24(b). Parties cannot change the nature of their argument on appeal. *Wright v. Briant*, 2011 Ark. App. 510. Consequently, we review the trial court's denial of their request for permissive intervention to determine if there was an abuse of discretion. We hold there was not.

The Goinses rely heavily on the fact that they had previously been allowed court-sanctioned visitation as part of the Whites' domestic-relations case. In *Quarles v. French*, 272 Ark. 51, 611 S.W.2d 757 (1981), our supreme court determined that the grandparents who were seeking intervention were not persons required to consent to adoption; and that since their consent was not required, the question remained whether they otherwise had standing to intervene in the proceeding—more precisely, whether the visitation rights previously granted them by the chancery court conferred a sufficient interest in the adoption proceeding that they had standing to intervene. *Id.* In reversing and remanding to the trial court, the supreme court explained:

> This decision is restricted to the narrow principle that grandparents who have been granted visitation pursuant to Ark. Stat. Ann. § 57-135 have a sufficient interest in adoption proceedings to entitle them to intervene for the limited purpose of offering such evidence as may be relevant to the focal issue, i.e., whether the proposed adoption is in the best interest of the children. In such cases, the court will weigh, among other considerations, the benefits flowing to the children from the granting of adoption, as

6

opposed to disadvantages which may result from the severing of ties between the grandparents and the grandchildren, as the two are incompatible under our law, unless consensual. If the court resolves the issue in favor of adoption, of course, appellants' legal right of visitation is automatically extinguished. If not, that right remains subject to the jurisdiction of the chancery court.

*Quarles*, 272 Ark. at 54–55, 611 S.W.2d at 759 (citations omitted). While the quoted language seems at first glance to support the Goinses' position, there are critical distinctions between the facts presented in *Quarles* and those presented here. The parent in *Quarles* was deceased. The grandchildren in that case were the children of the grandparents' deceased son. Here, Jennifer is not only alive, but also a party to the adoption proceeding, and she is actively opposing the adoption. Karen and Martin's rights of visitation are derivative of Jennifer's, and those rights are being represented by Jennifer in the adoption case.

In *Henry v. Buchanan*, 364 Ark. 485, 221 S.W.3d 346 (2006), the grandparents appealed from the denial of their motion to vacate an adoption order, arguing they had preexisting visitation rights with their grandchild but were not given notice of the adoption proceedings. Their daughter was *not* deceased but had given consent to the adoption. Our supreme court affirmed. While the *Henry* opinion dealt with a motion to vacate for lack of notice rather than a motion to intervene, the considerations are similar to those in seeking intervention because the grandparents were relying on their preexisting visitation rights. The court reviewed several cases and concluded:

> Accordingly, a review of this court's case law reveals that there are essentially two circumstances where a grandparent is entitled to notice of adoption proceedings: (1) statutorily, where the grandparent is the parent of a deceased child whose child is to be adopted; and (2) where the grandparent, despite the status of his or her child, has stood *in loco parentis* to the grandchild at some point.

*Henry*, 364 Ark. at 490, 221 S.W.3d at 349.

7

Here, Jennifer is not deceased, and we have concluded that the trial court did not clearly err in finding the Goinses did not stand *in loco parentis* to L.W. and Z.W. We are therefore not persuaded that the trial court abused its discretion in denying the Goinses' petition for permissive intervention.

Affirmed.

VIRDEN and BROWN, JJ., agree.

*John D. Bridgforth, P.A.*, by: *John D. Bridgforth*, for appellants.

*Danny Glover, P.A.*, by: *Danny Glover*, for appellees.